EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (CBN: 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
  312 North Spring Street, 14th Floor
  Los Angeles, California 90012
  Telephone: (213) 894-6166
  Facsimile: (213) 894-7177
  E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  vs.<br><br>$461,940.00 in U.S. Currency,<br><br>        Defendant. | NO. CV 16-7965<br><br>VERIFIED COMPLAINT FOR FORFEITURE IN REM<br><br>[18 U.S.C. § 981(a)(1)(A); 31 U.S.C. § 5317(b)(2)]<br><br>[I.R.S.] |

    The United States of America brings this claim against the defendant $461,940.00 in U.S. currency ("defendant currency"), and alleges as follows:

///

///

1

## JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and 31 U.S.C. § 5317(b)(2).

2. This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendant is $461,940.00 in U.S. currency seized on October 27, 2011 from Richard Tigran Kayseryan ("Kayseryan") in Glendale, California. The interests of Kayseryan may be adversely affected by these proceedings.

6. The defendant currency is in the custody of the United States Marshals Service, where it shall remain subject to this court's jurisdiction during the pendency of this action.

## INTRODUCTION

7. This complaint arises from an investigation of a health care fraud conspiracy involving billings for thousands of medically unnecessary prescriptions for expensive drugs issued from a sham clinic, which drugs were then sold on the black market. Investigation revealed that Tri-Med Medical Wholesale, Inc. ("Tri-Med") and its owner Kayseryan were facilitating the fraud by generating fraudulent invoices making it falsely appear that drugs acquired on the black market were acquired through legitimate wholesale drug orders.

8. In October 2011, investigators executed search warrants at 14 separate locations connected to that health care fraud investigation, including two locations associated with Tri-Med (and Kayseryan's residence, which was searched pursuant to consent). The evidence discovered as a result of the searches revealed that Kayseryan was involved in a multi-million dollar conspiracy to launder Tri-Med proceeds via deposits of Tri-Med checks issued by Kayseryan into bank accounts

for shell businesses, from which cash was subsequently withdrawn in structured amounts and returned to Kayseryan.

9. The investigation also revealed that Kayseryan and Tri-Med were involved in a health care fraud conspiracy to recycle drug stock acquired from a select group of corrupt pharmacies.

## THE MANOR MEDICAL INVESTIGATION

10. Manor Medical Imaging ("Manor") was a medical facility that was located in Glendale, California until approximately October 2011.

11. Beginning in early 2009, individuals working for Manor conspired to defraud Medicare and Medi-Cal of millions of dollars stemming from fraudulent billings for sham medical services and drug prescriptions. The takedown of the Manor investigation on October 27, 2011 included a search of Kayseryan's residence, where the defendant currency was found. There were also searches of Manor's business premises, multiple pharmacies, and the residences of other participants in the conspiracy.

12. Manor purported to be an Imaging Diagnostic Testing Facility (a medical imaging center performing imaging tests such as ultrasounds). In fact, the employees at the clinic perpetrated a scheme to defraud the Medicare and Medi-Cal programs by fraudulently acquiring expensive prescription drugs, in particular the expensive antipsychotic drugs Abilify, Seroquel, and Zyprexa, that they would then sell on the black market, in what is commonly known among law enforcement as a "drug restocking scheme." The conspirators would acquire prescription drugs by issuing sham prescriptions in the names of identity theft victims or recruited "patients" who were beneficiaries of the Medicare or Medi-Cal programs. The sham patients, many of whom received cash kickbacks, would have the sham prescriptions filled and then return the drugs to Manor. Manor employees would then remove any labels from the bottles and sell the drugs on the black market. In drug restocking schemes, pharmacies or drug wholesalers purchase the drugs on

the black market at a substantial discount and use the drugs to fill prescriptions (many of which are medically unnecessary), and then bill for the full price of the drugs distributed as part of potentially repeating loop of fraud.

## THE FRAUDULENT SCHEME

13. During the October 2011 search of Manor's business premises, investigators seized "pay/owe" sheets memorializing the black market sales. The pay/owe sheets reflected a list of prescription drugs, the number of bottles and strengths associated with each drug, the dollar amount that could be billed to Medicare and/or Medi-Cal for each bottle, and the actual amount paid to Manor for the drugs (usually around 50% of the billing rate). These pay/owe sheets were found at multiple areas in Manor, including the clinic's rear storage unit, where investigators also seized bankers' boxes containing numerous bottles of prescription drugs and associated pharmacy records, which records confirmed that the conspirators at Manor were re-acquiring drugs filled by third-party patients using prescriptions issued out of the clinic.

14. A recruiter for Manor ("L.M.") cooperated with the government following her arrest in October 2011 and provided related trial testimony about her recruitment of patients to receive and fill medically unnecessary prescriptions, which were then returned to the clinic in exchange for cash kickbacks. L.M. further testified that Manor was selling the collected prescription drugs back to pharmacies.

15. Between mid-May 2011 and November 2011, investigators witnessed a near-daily pattern in which recruiters such as L.M. would usher recruited persons to the rear of the clinic (*i.e.*, outside public view) and, a few hours later, Manor's drivers would load the patients into vans and drive them away. Some hours later, the drivers would return to Manor in the same vans – now empty of the patients – and would unload bags containing prescription medicine bottles. Investigators also witnessed conspirators loading cars with banker's boxes from the clinic (including

from the rear storage area) and drive away. Those boxes were of the same type as those seized from Manor's rear storage shed in October 2011 that contained the cache of drugs noted above.

16. During the investigation, investigators learned that at least three of the pharmacies that billed for large volumes of Manor prescriptions (Pacific Grand, Adams Square, and West Vern pharmacies, each located in Glendale, California) utilized Tri-Med for wholesale drug orders. Tri-Med was facilitating the restocking scheme by, among other things, helping to conceal the scheme when the conspiring pharmacies were audited by Medicare or Medi-Cal (specifically, by making it falsely appear that the drugs were legitimately purchased).

17. For example, in November 2010, Heidi Haffner, a Medicare auditor employed by CVS Caremark, noticed an increasing trend whereby, in response to CVS Caremark audits, some independently owned pharmacies (in particular, Russian and Armenian owned) were producing invoices showing that their inventories of medications had been purchased from Tri-Med. To Haffner's knowledge, CVS Caremark auditors had not received Tri-Med invoices from any other types of pharmacies, such as larger chain retail pharmacies. Haffner and her team noticed the invoices produced for drugs purportedly supplied by Tri-Med often appeared to be fake, in part because they often contained numerous spelling errors. Haffner also knew, based on more than 20 years of experience as an auditor, that most wholesale pharmaceutical invoices follow a standardized format. The Tri-Med invoices that she observed were in a different format that appeared to her to be generated in Microsoft Word. Haffner also observed that Tri-Med's website often advertised discounts on certain medications common to fraud schemes, including antipsychotics.

18. Investigators also learned of Tri-Med's involvement in a November 2010 Medi-Cal/California Department of Health Care Services ("DHCS") audit conducted at Pacific Grand (also referred to as "PGP") by RN Grace Britton.

During the audit, RN Britton spoke with PGP's owner, Peter Bagdasarian, who did not allow her to speak to other employees at the pharmacy. RN Britton further advised that Bagdasarian created multiple delays when she requested items from him.

19. From the audit, RN Britton learned that PGP purchased the majority of its medications from wholesalers HD Smith and Tri-Med. As part of the audit, she asked for PGP's records for wholesale drug purchases from February through August 2010, including wholesale supplies, drug sale history, and drug movement for drugs such as the antipsychotics Abilify and Zyprexa. Bagdasarian said he did not have these records available and that he would have Tri-Med fax the invoices to her. He provided a business card with Kayseryan's contact information, and Kayseryan later faxed forms to her that appeared to her to be fake. Like the invoices observed by Haffner, the invoices produced by Tri-Med to RN Britton appeared to have been generated in Microsoft Word rather than using the standard formatting generally used by drug wholesalers.

20. During the October 2011 takedown, investigators searched multiple pharmacies associated with the conspiracy, including Pacific Grand. During the search of Pacific Grand, investigators seized plastic bags containing more than 13,000 loose pills stored in plastic baggies, including the expensive antipsychotic drugs sought by Manor and similar fraud schemes (Abilify, Seroquel, and Zyprexa).

OCTOBER 2011 SEARCHES RELATED TO TRI-MED

21. The locations searched during the October 27, 2011 Manor takedown included two locations in Glendale associated with Tri-Med: its primary place of business (the "Santa Anita Avenue location"); and a second location (the "Victory Boulevard location") that was being used to house a tax preparation business operated by persons helping to launder proceeds for Kayseryan.

22. Kayseryan met with investigators at the Santa Anita Avenue location during the search, where he was served with a copy of the search warrant and advised that he was not under arrest and was free to leave the premises. Kayseryan confirmed understanding the advisement and indicated that he wished to remain at the location. Kayseryan also indicated a willingness to cooperate with the search, informing the investigators that he was the president and owner of Tri-Med and that the business had no other owners or board members.

23. Kayseryan subsequently gave the investigators written consent for them to search his residence in Glendale, California. Kayseryan and the investigators drove to his residence in separate cars, but the agents soon lost sight of Kayseryan's car. The first investigator to arrive at the residence saw Kayseryan's car and heard noise from the second floor of the residence that the investigator believed was consistent with paper being stuffed into a bag. Following the noise to its source, the investigator found Kayseryan in a bedroom on the second floor. The subsequent search of that bedroom revealed a door built into one of the walls that was half-open. In the space behind that door, investigators discovered a trash bag containing 35 white envelopes which in turn were found to contain a total of $459,100.00 in U.S. Currency (a portion of the defendant currency). When the bag was discovered, it appeared to have been stuffed into the space behind the door and had spilled over in a manner that led the investigators to believe (together with the fact that the door was partially open) that Kayseryan had attempted to hide the bag and its contents behind the door before the investigators arrived. The remainder of the defendant currency was located elsewhere in the residence.

24. When asked about the bag of currency during a subsequent consensual interview, Kayseryan denied that he had been found in the bedroom or that he had been attempting to conceal the money. He estimated that there was between $300,000 and $400,000 in the trash bag. When asked why the cash was in the

Case 2:16-cv-07965 Document 1 Filed 10/26/16 Page 8 of 14 Page ID #:8

bedroom, Kayseryan claimed that he did not trust banks and preferred to keep the money, which he referred to as his "life savings," to himself. However, both Kayseryan and Tri-Med had bank accounts, and Kayseryan acknowledged during the interview that he used bank accounts for Tri-Med's business proceeds.

25. During the search of the Victory Boulevard location, investigators found multiple bundles of processed checks written against Tri-Med bank accounts and issued to third parties ("the seized bundles"). The seized bundles included processed checks, check stubs, bank transaction receipts, and handwritten ledgers. The majority of the checks were written to companies that were later determined to be shell companies established either by Kayseryen or at his direction (including 21st Century Merchandising, Arka Insurance and Financial Services ("Arka"), Roma Measuring Systems ("Roma"), Global Processing and Marketing Services ("Global Processing"), Accounting 2 Taxes ("Accounting to Taxes"), Forwardex Corporation, World Financial Freedom, Royal Financial Holding ("Royal Financial"), Joe Red Electric, and Advertise for Less Inc. (collectively, the "Shell Corporations")), or to bank accounts (the "Shell Accounts") in the names of people whose identities were being used, either knowingly or unknowingly, to conceal or disguise the nature, source, location, control or ownership of the proceeds of the fraud scheme. The transaction receipts showed that the Tri-Med checks were often posted at different banks on consecutive days or, in some instances, on the same day at different banks within 20 minutes of each other, which is banking activity indicative of money laundering and structuring.

26. The seized bundles suggested that the Shell Corporations and Shell Accounts were involved in structuring and/or money laundering. Processed checks are records that are ordinarily kept by the payees of checks, not the payors. Yet, during the October 2011 search of the Victory Boulevard location, investigators seized processed Tri-Med checks issued to the Shell Corporations, indicating that

8

Kayseryan (either personally or through others) controlled both the issuance and deposit of the checks, effectively acting both as payee and payor.

27. The seized bundles were indicative of structuring because they showed that cash was generally withdrawn from the Shell Accounts in structured transactions (that is, in amounts at or below $10,000 to avoid the respective bank's requirement to report over-$10,000 cash transactions to the federal government), often at or near the time that Tri-Med checks were deposited into the Shell Accounts. Specifically, the bundles included JB Morgan Chase ("JPMC"), Wells Fargo Bank ("WFB"), and/or Bank of America ("BofA") transaction receipts that showed the date and time of each check deposit and cash withdrawn.

## ANALYSIS OF SHELL ACCOUNTS

28. The financial records related to the Shell Accounts and other bank accounts revealed a complex network of financial transactions involving funds transferred from Tri-Med's BofA accounts (ending in 7918 and 2349) and Tri-Med's City National Bank ("CNB") account (ending in 1925) to the Shell Accounts. Between January 2010 and December 2012, the total amount of Tri-Med checks deposited into the Shell Accounts was approximately $16.8 million. Millions of dollars in cash were withdrawn from the Shell Accounts over the same time period as part of a structuring and money laundering conspiracy.

29. Table A hereto, incorporated by this reference, sets out the approximate total amounts of Tri-Med checks deposited into each of the Shell Accounts from 2010 through 2012.

30. Table B hereto, incorporated by this reference, shows approximately $400,000 in structured cash withdrawals made from certain of the Shell Accounts.

31. The corporate Shell Accounts were associated with corporations that did not conduct legitimate business but were instead used both to conceal Tri-Med proceeds and reduce its tax liability by inflating its apparent business expenses. Records from the California Secretary of State corroborate that the corporations

.

did not actually conduct legitimate business with Tri-Med, but were instead used to funnel illegal proceeds. With one exception, one or all of three individuals created, were officers of, or were otherwise associated with the corporations, as shown below:

    a.    World Financial Freedom, Inc. was incorporated on December 22, 2009 by [Tri-Med employee 3], who is also listed as an officer of the corporation.

    b.    Royal Financial Holdings, Inc. was incorporated on December 22, 2009 by [Tri-Med employee 3], who is also listed as an officer of the corporation.

    c.    Roma Measuring Systems, Inc. was incorporated on April 23, 2004 by an individual with initials W.P, and [Tri-Med employee 1] is listed as an officer of the corporation.

    d.    Joe Red Electric, Inc. was incorporated on May 23, 2003 by [Tri-Med employee 3].

    e.    ForwardEx Corp. was incorporated on October 9, 2007 by [Tri-Med employee 3].

    f.    Arka Insurance and Financial Services, Inc. was incorporated on December 15, 2003 by [Tri-Med employee 3], who is listed as an officer of the corporation.

    g.    Advertise 4 Less, Inc. was incorporated on December 22, 2009 by [Tri-Med employee 3], who is listed as an officer of the corporation.

    h.    Accounting 2 Taxes, Inc. was incorporated on September 5, 2002 by [Tri-Med employee 3], who is listed as an officer of the corporation.

i. Asset Financial Solutions, Inc. was incorporated on December 22, 2009 by [Tri-Med employee 3]. [Tri-Med employee 2] is listed as an officer of the corporation.

j. 21st Century Merchandizing, Inc. was incorporated on December 22, 2009 by [Tri-Med employee 3]. [Tri-Med employee 1] is listed as an officer of the corporation.

k. Meguerdi, Inc. was incorporated on April 5, 2011, and an individual with initials H.M. is listed as Officer.

## THE STRUCTURING ACTIVITY

32. Banks are required to file a Currency Transaction Report ("CTR") with the IRS when they receive a cash deposit or process a cash withdrawal of more than $10,000.00 in a single calendar day. Multiple transactions are treated as a single transaction if the bank has knowledge that they are conducted by or on behalf of the same person, and they result, in substance, in the bank receiving or paying out more than $10,000.00 in currency in a single calendar day. Accordingly, the CTR reporting requirement is triggered when over a period of time multiple cash deposits or withdrawals are made, none of which standing alone exceed $10,000.00 but, when combined, exceed the $10,000.00 CTR reporting threshold.

33. Many individuals who are aware of the CTR reporting requirements take active steps to cause banks to fail to file CTRs. The active steps may include making multiple cash deposits or withdrawals, each in an amount less than $10,000.01, at the same bank on the same day or within a few days of each other, in order to avoid having the bank file the required CTR report. For example, a person attempting to avoid the filing of a CTR when withdrawing cash will make several separate withdrawals, each of which is below the reporting requirement, and make the withdrawals at three separate times during the same day or week, or at different bank locations, believing that splitting the withdrawals will avoid the

bank filing a CTR. This is not always successful, however, as many banks use computer software that is able to detect such activity and will generate a CTR without the knowledge of the person attempting to avoid the report.

34. Based on bank surveillance photographs, interviews with bank personnel, and other evidence gathered as a result of the investigation, plaintiff alleges that at least two employees of Kayseryen and Tri-Med were involved in the systematic laundering of the proceeds of the above-described fraud scheme.

35. The laundering included numerous structured withdrawals of currency from the Shell Accounts. Kayseryen, after creating the Shell Companies or causing them to be created, would thereafter open (or cause to be opened) bank accounts in the names of the Shell Companies, his employees, or family members of his employees. He would then provide the employees with checks drawn against Tri-Med accounts and made payable to holders of the Shell Accounts. The employees were instructed to deposit the Tri-Med checks into the Shell Accounts, and then withdraw the proceeds of the negotiated checks in currency. Each of the withdrawals was made in an amount less than $10,000, in order to avoid the CTR reporting requirement. The cash was then returned to Kayseryen.

36. Plaintiff alleges on information and belief that some of the structured currency was used to acquire more prescription drugs. Kayseryen would sometimes pay pharmacies for medications that were about to expire. He would then return those medications to the manufacturers for a refund of the original purchase price paid to the manufacturer.

<center>FIRST CLAIM FOR RELIEF

(18 U.S.C. § 981(A)(1)(a))</center>

37. Based on the above, plaintiff alleges that the defendant currency represents property involved in one or more violations of 18 U.S.C. §§ 1956 and/or 1957, rendering it subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

///

## SECOND CLAIM FOR RELIEF

(31 U.S.C. § 5317(c)(2))

38. Based on the above, plaintiff further alleges that the defendant currency is property that was involved in one or more violations of 31 U.S.C. § 5324, or a conspiracy to commit such violations, rendering it subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant currency;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendant currency to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: October 26, 2016
EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

 /s/ Steven R. Welk
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
United States of America

**VERIFICATION**

I, Oleg Pobereyko hereby declare that:

1. I am a Special Agent with the Internal Revenue Service - Criminal Investigation and am the case agent for the forfeiture matter entitled *United States of America v. $461,940.00 in U.S. Currency*.

2. I have read the above Verified Complaint for Forfeiture In Rem and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 24, 2016 in Los Angeles, California.

*/s/ Oleg Pobereyko*
OLEG POBEREYKO